IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERIC BENJAMIN TRAYLOR, | § | |
| #02200139, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:23-cv-00335-K (BT) |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Eric Benjamin Traylor, a Texas prisoner proceeding *pro se*, filed a petition

for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his capital murder

conviction. ECF No. For the reasons below, the Court should **DENY** Traylor's

habeas application.

**Background**

**A.    The Offense**

The Thirteenth Court of Appeals provided the following summary of the

offense:

> Traylor was in a romantic relationship with Amirah Shahin. The
> couple had a four-month-old son named R.T., and Shahin had a
> twenty-month-old daughter, A.G., from a previous relationship.[1] The
> couple and their children lived together in a home in Venus, Texas.
>
> On February 23, 2017, Traylor dropped off Shahin at her job at 4:00
> p.m. so she could work the night shift as a transport officer for the La

---

[1] The Court of Appeals used initials to protect the identity of the children. This
Court does the same.

Salle Unit of the Johnson County Jail. Traylor then took the children to his brother Santwan Traylor's house, where A.G. ate and played with her three little cousins. At approximately 8:00 p.m., Traylor left to return to home. Traylor said that, while he was taking the children out of his vehicle, A.G. accidently "clipped" the back of her head on the car door. The three went inside. Traylor recalled that he bathed A.G. and then they watched a movie until she fell asleep at 10:00 p.m.

Traylor reported that A.G. slept through the night and awoke the next morning at about 8:00 a.m. He made her a sausage and egg breakfast burrito and then went to shower. When he got out of the shower five minutes later, he discovered that A.G. was choking on the burrito and not breathing. He said he slapped her out of panic to help revive her. He frantically called 911.

Detective Sergeant Mateo Villarreal of the Venus Police Department was the first responder to the 911 call. When Villareal arrived, he noticed A.G. was "extremely unresponsive." He reported that her skin was discolored, bruising was forming around the left temple area of her face, and that her eyes "appeared lifeless." He knew that she needed immediate medical attention. Villarreal testified that he first tried to get his finger in A.G.'s mouth to clear her airway but had difficulty doing so because her jaw was locked. Based on this observation, he thought she might be having a seizure. He did see some food matter on the left side of her mouth, so he wiped it away with a towel. He then performed a sternum rub on the little girl with his knuckle to try to get a reaction, but A.G. did not respond. Villareal immediately requested a CareFlight helicopter evacuation. Villareal testified that Traylor told him, "I hit her—I didn't know—I didn't know what to do." Traylor also mentioned to Villareal that A.G. hit her head the night before. Medics arrived to treat A.G. and transport her to the air flight landing zone.

Flight medic Robert Gomez testified that as soon as medics arrived at the landing zone, he intubated A.G. He noted that A.G. had a 3 on the Glasgow Coma scale, which means "no response, no talking, no orientation, and no movement." He observed bruising on A.G.'s face, head, and chest. He testified that, in his twenty-two-year career, he had never seen blunt force brain trauma from a slap on the head. A.G. was flown to Cook Children's Hospital in Fort Worth, Texas for further treatment.

Detective James Novian with the Johnson County Sheriff's Office went to the hospital to investigate. A.G. was in the intensive care unit and medical personnel advised Novian that she had no brain activity at the time. Novian photographed bruising on and above A.G.'s right eye, and he noticed bruising begin to appear on the right side of her forehead up to her hairline and towards the back of her head. He also photographed a separate area of bruising above her left eye. Novian further noted bruising on A.G.'s shoulder—he stated it was "darker [whereas] on the face it [was] red and it move[d] up into a darker bruise." Novian also photographed some bruising on her abdomen—he commented that they had a "yellowish-green tint around them," indicating they were older injuries.

Sergeant Jay Kniffen was also assigned to the Johnson County Sheriff's investigation. He stated that he arrived at the Traylor home shortly after A.G. had been transported to the CareFlight landing zone. Kniffen asked Traylor to go to the police department for questioning. Traylor agreed and arrived on his own. During questioning, Novian called Kniffen to inform him that doctors found blunt force trauma to A.G.'s head, significant brain injury, and that her prognosis was not good. Traylor admitted that he hit A.G. but only because he panicked when he realized she was choking and could not breathe.

Sergeant Kniffen further testified that during his investigation, he came upon certain text messages between Traylor and his mother, Angelee Casas, that were exchanged while A.G. was in the hospital. During his direct examination at trial, he testified as follows:

Q.    So if you could begin reading these messages, please. Again, I'm indicating here message No. 412. Are you aware who that message is to?

A.    I believe that's to his mother, Angelee Casas.

Q.    All right. Please just begin reading these messages for the Jury.

A.    The first one, 412, says: "In customer." Then he texted her again and says: "Custody." She asked him: "Why?" And she says, "Please tell me what happened." From the mother again: "[A.G.] has head trauma and sleeping—swelling to the brain." And then she basically corrected herself in that last one, said: "Swelling."

3

Q.      Going to the next page, begin at 418, please, sir.

A.      Its from his mother again, says: "Please tell me." And he tells her to call his lawyer. And then she asks for the number. And then he tells her Curt Crum. And she again says: "Please tell me what happened so they can help her live, please, Eric." And then he says: "I think she has had this problem." From the mother, Angelee Casas: "No, they said she had severe head trauma."
        . . .

A.      It's from his mother: "Everybody at the hospital is here for [A.G.]." From his mother. "Everybody is there supporting her." Then she says: "I need you to tell me what happened." And the defendant says: "Lawyer." From the mother: "No, Eric, [A.G.] might die." And then he says: "What?" And then the mother says: "I don't know Eric. I just want the truth, please." She then—she again says: "For [A.G.], please."

Q.      Go ahead, sir.

A.      Mother again: "She loved you." He says: "I love her too." She says: tell me what happened." And he says: "Amirah." Again it goes on to the mom: "Amirah was not doing transport . . . "

        . . .

Q.      Move forward to message No. 492, please.

A.       It's from his mother again. "They say if she lives she will be permanently brain damaged." And then he tells her: "I didn't hit her." From the mother to him: "What happened to her? They said she didn't choke." And Defendant to his mother: "I was thinking that if she had this problem for awhile maybe it triggered today." And to his mother again: "If I beat her, where are the bruises?"

Q.      Let me stop you right there for a moment, Detective. By this point, so we're up to now 2:30 in the afternoon of February 24th at that point; is that correct?

A.      Correct.

Q.    By that point, are you aware whether or not [A.G.]'s body was showing signs of abuse?

A.    There—she was.

Q.    She was?

A.    Yes.

Q.    Bruising and such?

A.    Bruising on the left side of her head.

Q.    Now, at that point they'd also determined she had certain internal injuries; is that correct?

A.    Correct.

Q.    What internal injuries at this point have they realized [A.G.] had suffered?

A.    It was severe trauma to the left side of her brain.

Q.    Okay. Bleeding or what?

A.    Bleeding, yes, sir.

Q.    If you can continue from that message 4—

A.    It's 497. Says, from his mother: "I don't know, Eric." He asks: "Is she okay?" And asks her again: "Somebody please tell me what you know."

Q.    Okay, Go ahead there, message 500.

A.    No. 500, to his mother again: "What do you think?" From Eric, or from the Defendant. "I think you hit her, Eric, but not on purpose. I think you were tripping and didn't realize what you did." And to his Mother: "Well, that's what they think." To his mother again: Have you spoke with Amirah yet?" She says: "Who?" And then he says: "Detective." And then from his mother, she says: "No." And then mother again: "I haven't." And then to his mother: "Have you spoken to Amirah?"

5

Q.    Ask you to begin here at message 514, please.

A.    Okay. From his mother again: "I can't do this right now, Eric." To his mother: "I know I was hard on her but I only meant well." From his mother: "What the f*ck you mean?" And to his mother: "She will live." To his mother again: "I ain't saying I did it." To his mother again: "What did they say about [R.T.]?" And from his mother: "I know you did now. I'm sorry and I love you, son, but this is too much for me to take right now." To his mother: "You all got it wrong."

After Traylor was in custody, he made a series of phone calls to relatives which were recorded. In one phone call, he told a relative that A.G. fell from the tailgate of Santwan's Ford F-150 pickup truck the night before and hit the front of her head on concrete. When Detective Kniffen followed up with Santwan and his wife regarding this story, however, neither recalled A.G. falling in this manner at their home.

Jamye Coffman, M.D., Medical Director of the CARE Team at Cook Children's Hospital in Fort Worth, testified. Dr. Coffman reviewed A.G.'s CT scan and testified that A.G. had subdural hemorrhage which covered the left side of the brain and had subscapular bruising. Dr. Coffman also reported that A.G.'s brain was herniating, meaning her brain was "swelling to the point that it's pushing down onto the brain stem in the different areas that are necessary for life . . ." Dr. Coffman testified that choking would not cause this bruising or subscapular bruising. He also stated that being clipped by a car door could cause an injury "but not the whole constellation of injuries" seen on A.G. Dr. Coffman ordered a skeletal survey of [A.G.], which included images of her spine, chest, ribs, pelvis, extremities, hands and feet. There were no old or new fractures. The doctor acknowledged that young children can get bruised in a variety of ways, given their age and development.

The medical examiner who performed A.G.'s autopsy, Dr. Tasha Greenberg of the Tarrant County Medical Examiner's office in Fort Worth, testified that she declared the manner of death as "homicide."

Shahin testified that the night of February 23, she talked to Traylor at 10:00 p.m. He told her A.G. was asleep but did not mention that A.G. had "clipped" her head or fallen from Santwan's truck earlier in the day. At midnight, Traylor sent Shahin a text stating, "Why are you ignoring me?" Traylor also tried to call but Shahin responded, "I can't

6

talk in room." In the morning, the couple began texting again. At 8:30 a.m., Traylor texted, "I text you but no response, and last night you hardly text so I fell asleep on you." When Shahin asked whether she could get a ride home from work from Traylor, Traylor responded with a message asking, "What are you trying to do, have him take you home[?]" Shahin explained that Traylor was asking if her work partner, Derek Williams, was going to give her a ride home. At 8:42 a.m., Traylor texted, "the driver [Williams] give you a ride[?]" And then, "Answer me." At 8:47 a.m., Traylor continues, "See you been playing this beat around the truth shit all night. I don't know what to think. You didn't even ask me yet. You getting a ride with that fool. All right. I see how it is. Bet that love." At 9:07 a.m., he called 911 for A.G.

Shahin told authorities that Traylor was the children's primary caretaker because she worked. Shahin also told them that A.G. loved Traylor and that Shahin "never had a doubt" she could leave her children with him.

*Traylor*, 2020 WL 1858010, at *1-4.

## B. Procedural History

Traylor was charged by indictment with capital murder for knowingly and intentionally causing the death of an individual younger than ten years old. ECF No. 25-30 at 22. A Johnson County jury found him guilty and sentenced him to life without the possibility of parole. ECF No. 25-30 at 17; *State of Texas v. Eric Benjamin Traylor*, F201700359 (413th Dist. Ct., Johnson Cnty., Tex. June 8, 2018).

On April 9, 2020, the Thirteenth Court of Appeals affirmed the trial court's judgment. *Traylor v. State*, 2020 WL 1858010 (Tex. App.—Corpus Christi-Edinburg [13th Dist.] Apr. 9, 2020, pet. ref'd) (mem. op.). Traylor was permitted to file an out-of-time Petition for Discretionary Review (PDR), which the Texas Court of Criminal Appeals (CCA) refused on November 10, 2021. *See id.*; *Ex parte*

*Traylor*, WR-92,390-01, 2021 WL 2346538 (Tex. Crim. App. June 9, 2021);
*Traylor v. State*, PDR No. PD-0502-21 (refused Nov. 10, 2021); Case Detail
(txcourts.gov) (indicating that the CCA refused the PDR on November 10, 2021;
last visited October 24, 2024).

Traylor filed two state habeas applications challenging his conviction on
February 3, 2023. ECF No. 25-30 at 48; ECF No. 25-31 at 46. The next day, he filed
a federal habeas application. ECF No. 1. He later moved to stay the federal
proceeding pending the state habeas proceeding. ECF. No. 7.

On March 10, 2023, Traylor filed an amended federal habeas petition. ECF
No. 9.[2] He presents the following claims for relief:

1. His trial counsel was ineffective because his trial counsel: (a) failed
   to object that a portion of the State's medical expert testimony was
   hearsay and violated the Confrontation Clause; (b) failed to request
   a mistrial when the trial court found out that an Assistant District
   Clerk commented on social media about the case; (c) failed to move
   to suppress recordings of his jail phone calls; and (d) failed to file
   a written motion to suppress a video of a police interview.

2. He was denied his right to due process because the prosecutor
   made a racially derogatory comment during closing arguments.

ECF No. 9 at 6-8.

On April 5, 2023, the CCA denied Traylor's state habeas applications without
written order. ECF No. 25-32; *Ex parte Traylor*, WR-9,390—02, 03 (Tex. Crim.
App. Apr. 5, 2023). This Court found that Traylor's motion to stay was moot and

---

[2] The amended petition is the operative pleading. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

ordered the State to respond to his federal application. ECF Nos. 16, 17. The State filed a response on October 13, 2023. ECF No. 24. Traylor did not file a reply.

## Legal Standards

Because the CCA denied Traylor's claims on the merits, he must overcome the AEDPA's relitigation bar to obtain federal habeas relief. *See*, *e.g.*, *Neal v. Vannoy*, 78 F. 4th 775, 782 (5th Cir. 2023) (citations omitted). Under 28 U.S.C. § 2254(d):

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"This intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in the state court proceeding." *Isidro Ramos, III v. Dir., TDCJ-CID*, 2024 WL 3614675, at *3 (W.D. Tex. July 31, 2024) (citing *Harrington v. Richter*, 562 U.S. 86, 102 (2011)) (citing, in turn, *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 380-84 (2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

A determination of a factual issue by a state court is presumed to be correct, and that presumption may be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness applies to both express and implied factual findings. *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004). Absent express factual findings, a federal court may imply factual findings consistent with the state court's disposition. *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983).

As long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court determination that a claim lacks merit precludes federal habeas relief. *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, petitioner must show that the state court's ruling was 'so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Ramos, III*, 2024 WL 3614675, at *3 (citing *Richter*, 562 U.S. at 103; *Bobby v. Dixon*, 565 U.S. 23, 24 (2011)).

And "even if a petitioner can shoehorn his claim into one of the relitigation bar's exceptions, he 'still must show, on de novo review, that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Senn v. Lumpkin*, No. 23-10661, 2024 WL 4100322, at *4 (5th Cir. Sept. 6, 2024) (citing *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc)) (quoting, in turn, *Salts v. Epps*, 676 F.3d 468, 480 (5th Cir. 2012); 28 U.S.C. § 2254(a)) (quotation omitted). Part of that analysis entails asking whether the petitioner has shown that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Brown v. Davenport*, 596 U.S. 118, 134 (2022) ("Today, then, a federal court must *deny* relief to a state habeas petitioner who fails to satisfy this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both [*Brecht* and the AEDPA].") (emphasis in original).

### Analysis

1. The CCA reasonably applied *Strickland* in denying Traylor's ineffective assistance of counsel (IAC) claims.

Traylor claims that his trial counsel was ineffective. To succeed on an IAC claim, a petitioner must show "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional

norms prevailing at the time counsel rendered assistance. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The standard requires the reviewing court to give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 689. The right to counsel does not require errorless counsel; instead, a criminal defendant is only entitled to reasonably effective assistance. *Murray v. Maggio,* 736 F.2d 279, 281-82 (5th Cir. 1984); *Boyd v. Estelle,* 661 F.2d 388, 389 (5th Cir. 1981).

Additionally, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. The petitioner must "affirmatively prove," not just allege, prejudice. *Id.* at 693. If he fails to prove prejudice, the court need not address counsel's performance. *Id.* at 697.

On federal habeas review, the Court's analysis of IAC claims is even more deferential. When the state court has adjudicated the claim on the merits, a federal court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *See Woods v. Etherton,* 578 U.S. 113 (2016) (citing *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Richter,* 562 U.S. at 101. Federal courts consider IAC claims mixed questions of law and fact; and so must analyze them under the

"unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010).

    a.  Failure to Object to Testimony Regarding "Critical Case Review"

Traylor claims that his counsel should have objected to Dr. Tasha Greenberg's testimony that other medical examiners agreed with her autopsy opinion as part of a "Critical Case Review." ECF No. 9 at 6. He argues that Dr. Greenberg's testimony was inadmissible hearsay and violated the Confrontation Clause.

Dr. Greenberg testified that she performed an autopsy on A.G. in which she concluded that the cause of death was complications of blunt force trauma of the head, and the manner of death was homicide. ECF No. 25-9 at 118; ECF No. 25-11 at 1-3. Dr. Greenberg's autopsy report was admitted into evidence. ECF No. 25-9 at 118-19. Dr. Greenberg certified that the findings about the cause and manner of death were her opinion. *Id.* at 128. Dr. Greenberg explained the process and findings of her autopsy. *Id.* at 128-48. She was asked about a portion of the report stating that "this case was presented at Critical Case Review." *Id.* at 148. She explained that, at a Critical Case Review, the findings and photographs of an autopsy are discussed among other professionals, and the group usually comes to a "consensus opinion" about the "cause and manner of death" before a death certificate is generated. *Id.* at 149. Dr. Greenberg testified that the group agreed that the victim's manner of death was homicide. *Id.* at 151. She explained the basis for her opinion that the victim's death was a homicide and not the result of an

accident like choking, being clipped by a car door, clumsiness, falling from a couch or the tailgate of a car, or a preexisting condition. *Id.* at 153-156.

As an initial matter, Dr. Greenberg's testimony that other professionals concurred with her findings was not hearsay under Texas law because it was not offered for the truth of the matter asserted. Rather, as the State points out, Dr. Greenberg had already testified to the findings in her autopsy report—indeed, the report itself had already been admitted into evidence—and she merely explained the process by which her findings were reviewed and approved for purposes of generating a death certificate. Because the testimony was not hearsay, an objection on that basis would have been futile, and counsel need not make futile objections. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (citing *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (per curiam)).

As for the Confrontation Clause, the CCA could have reasonably determined that Dr. Greenberg's testimony did not violate it, so there was no reason for trial counsel to object. The Sixth Amendment prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). "The Confrontation Clause applies to testimonial hearsay and does not bar the admission of nonhearsay statements." *United States v. Ballesteros*, 751 F. App'x 579, 579-80 (5th Cir. 2019) (per curiam) (citation omitted). "To qualify as 'testimonial' under this standard, 'a statement must have a primary purpose of establishing or proving past events potentially

14

relevant to later criminal prosecution.'" *United States v. Noria*, 945 F.3d 847, 851-2 (5th Cir. 2019) (citing *Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011)) (internal alterations and quotation marks omitted).

The Critical Case Review panel's agreement with Dr. Greenberg's autopsy opinion did not violate Traylor's rights under the Confrontation Clause because that agreement was not—as explained above—hearsay. *See*, *e.g.*, *United States v. Quintanilla* 114 F.4th 453, 473 (5th Cir. 2024) (explaining that the hearsay inquiry is a necessary precursor to the Confrontation Clause inquiry). Nor was it testimonial under clearly established Supreme Court precedent. As the State contends, the Critical Case Review panel concurred that the victim's death was a homicide for purposes of generating a death certificate—not to establish or prove events related to Traylor's prosecution. *See Noria*, 945 F.3d at 851-52. Thus, any objection to this testimony on Confrontation Clause grounds likely would have been overruled, or, at the least, the CCA could have reasonably come to that conclusion in denying the IAC claim.

But even if there were a Confrontation Clause violation, Traylor fails to show *Strickland* prejudice. Even without testimony about the Critical Case Review panel decision, Dr. Greenberg testified that she was the one who conducted the autopsy, generated the autopsy report, and that the findings and cause and manner of death were her opinion. ECF No. 25-9 at 128-48. She explained the autopsy process and her findings and opined that none of the other accidental causes of death the defense provided were consistent with A.G.'s injuries. *Id.* at 153-56. The autopsy

report itself was admitted into evidence. ECF No. 25-11 at 1-3. That other professionals accepted the autopsy opinion was merely cumulative of Dr. Greenberg's testimony and the report itself.

In sum, the CCA reasonably applied *Strickland* in denying Traylor's claim that his counsel should have objected to Dr. Greenberg's testimony, and he is not entitled to habeas relief on it.

B.    Failure to Request Mistrial

Traylor claims that his attorney was ineffective for not seeking a mistrial when the trial court learned during jury deliberations that an Assistant District Clerk commented on Traylor's trial on social media. ECF No. 9 at 6. The social media post included an article related to Traylor's case and a caption stating: "[s]o sad, worst case I've heard so far." ECF No. 27 at 114.

The CCA has held that "[a] mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc) (citation omitted). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* (citation omitted).

Here, there is no evidence that any jury member saw the post, much less considered it in his or her deliberations. Without such evidence, Traylor cannot show that the post was prejudicial, and a request for a mistrial would have been futile.

Even assuming a juror saw the post, the trial court's standard instructions to the jury alleviated any potential prejudice. Specifically, the trial court instructed the jury that "[i]n deliberating on the cause, you are not to refer or discuss any matter or issue not in evidence before you . . . You are charged that it is only from the witness stand that the Jury is permitted to receive evidence regarding the case or any witness therein. No juror is permitted to communicate to any other juror anything he or she may have heard regarding the case or any witness therein from any other source other than the witness stand." ECF No. 25-10 at 15. It is presumed that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Traylor presents no argument to the contrary here. Thus, given the jury charge and the jury's presumed adherence to it, a request for a mistrial would have been futile even assuming a juror saw the post, and, again, counsel need not make futile objections.

The CCA reasonably applied *Strickland* in rejecting this claim, and Traylor is not entitled to habeas relief on it.

C.     Failure to Move to Suppress Jailhouse Phone Calls

Traylor's counsel stipulated to the admissibility of Traylor's jailhouse phone calls to family members. Traylor now claims that his counsel should have moved to suppress the recordings because the recordings were made without his consent

17

in violation of the Fourth Amendment and Texas's former wiretapping statute, Tex. Crim. Proc. Art. 18.20.[3] ECF No. 9 at 7. Traylor's claim lacks merit.

First, the record shows that counsel's decision to stipulate to the admissibility of the jail calls was a strategic decision—indeed, a decision that Traylor agreed with on the record. ECF No. 25-8 at 7-8. Traylor's counsel determined that the recordings contained both beneficial and detrimental conversations, and he determined that the good outweighed the bad. ECF No. 25-30 at 71. That the decision to stipulate to the admission of the jail calls was strategic is further confirmed by counsel's reliance on the jails calls in his closing arguments. *See* ECF No. 25-10 at 37.

"Informed strategic decisions of counsel are given a heavy measure of deference and will not be second guessed." *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir.), *cert. denied*, 522 U.S. 944 (1997) (*Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996)). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (quotations omitted).

---

[3] Tex. Crim. Proc. art. 18.20, entitled "Detection, Interception, and Use of Wire, Oral, or Electronic Communications," was repealed in 2019 and moved to Tex. Code. Crim. Proc. Chapter 18A without substantive changes. H.B. 2931, 85th Leg., (Tex. 2017) (effective Jan. 1, 2019).

Traylor fails to show how the strategic decision "permeate[d] the entire trial with obvious unfairness." *Jones*, 287 F.3d at 331. He offers no argument on this issue. Accordingly, he fails to show that his counsel was ineffective for stipulating to the admissibility of the jail calls.

Second, an objection to the jail calls based on the Fourth Amendment or Texas law would have been futile. "Where defense counsel's failure to litigate a Fourth Amendment claim is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (collecting cases). Courts have held that "pretrial detainees and inmates have no reasonable expectation of privacy in personal calls they make from the institution." *United States v. 89.9270303 Bitcoins*, 2021 WL 4307375, at *5 (W.D. Tex. Sept. 22, 2021) (citing *Evans v. Skolnik*, 997 F.3d 1060, 1068 (9th Cir. 2021) (quoting *United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996)) ("no prisoner should reasonably expect privacy in his outbound telephone calls")); *United States v. Gangi*, 57 F. App'x 809, 815 (10th Cir. 2003) ("any expectation of privacy in outbound calls from prison is not objectively reasonable and the Fourth

19

Amendment is therefore not triggered by routine taping of such calls"); *United States v. Madoch*, 149 F.3d 596, 602 (7th Cir. 1998) (same); *Sanders v. Bradley*, 47 F.3d 1170 (6th Cir. 1995) (prison inmates have no reasonable expectation of privacy in phone conversations); *McCassey v. Hamilton*, 2015 WL 4644907, at *2 (W.D. Tex. Aug. 4, 2015) (same). Thus, because Traylor had no expectation of privacy in his jail phone calls, the recording of those calls did not violate the Fourth Amendment, and an objection on that basis would have been futile.

Texas courts interpreting TEX. CODE CRIM. PROC. Art. 18.20 came to the same conclusion about challenges to jail calls under that statute, at least where the inmate was informed that his calls may be monitored. *See*, *e.g.*, *Hernandez v. State*, 2005 WL 2043641, at *6 (Tex. App.—Austin Aug. 26, 2006) ("Because we have already held that appellant had no reasonable expectation of privacy, we hold that the recordings of his calls did not violate the wiretapping statute."); *Sanchez v. State*, 2005 WL 1536219, at *7 (Tex. App.—Austin June 30, 2005) (recording of jail calls did not violate Texas Wiretap Statute where inmates were admonished that their calls were recorded).

In sum, Traylor's counsel's decision not to challenge the jail calls was strategic, and Traylor fails to show that it was so ill chosen that it permeated the trial with unfairness. The jail calls did not violate the Fourth Amendment or state law, so any objection would have been meritless. The CCA reasonably applied *Strickland* in rejecting this claim, and Traylor is not entitled to habeas relief on it.

      D.     Failure to File Written Motion to Suppress Police Interview Video

Traylor claims that he received ineffective assistance of counsel because his counsel orally moved to suppress a video recording of his interview with police that he gave before receiving his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Traylor insists that his counsel should have filed a written motion. ECF No. 9 at 7.

First, Traylor fails to show ineffectiveness. While the trial court did ask Traylor's counsel if he had filed a written motion, it is unclear that the trial court denied the motion because it was not in writing. ECF No. 25-8 at 114. Traylor's attorney submitted an affidavit in the state habeas proceedings claiming that motions to suppress need not be in writing so long as the motion is made in a timely manner, that is, as soon as the ground for objection becomes apparent. ECF No. 25-30 at 73. Traylor's counsel claimed that his motion was timely because he made it as soon as he learned that the prosecution intended to play the video to the jury. *See id.*

Assuming Traylor's counsel's assertions are correct—an assumption which is appropriate given the state habeas court's implicit finding that Traylor's counsel's affidavit was truthful and Traylor's failure to rebut that finding under § 2254(e)(1)—Traylor does not explain why it was ineffective to orally move to suppress the interview. Accordingly, the CCA could have reasonably determined that Traylor's counsel provided effective assistance in orally moving to suppress the police interview video.

Second, even assuming that an oral motion was improper, Traylor fails to show prejudice because he fails to show that a written motion would have been successful and led to a reasonable likelihood of a different outcome. The Fifth Amendment's prohibition against self-incrimination requires that an accused be advised of his right to remain silent and his right to the presence of an attorney before custodial interrogation. *Miranda*, 384 U.S. at 479; *Dickerson v. United States*, 530 U.S. 428, 435 (2000). "Absent these warnings or their 'fully effective equivalent,' the state may not offer a defendant's resulting custodial statements as evidence of his guilt." *Sheffield v. Davis*, 2019 WL 13318136, at \*5 (W.D. Tex. Mar. 25, 2019) (citing *Miranda*, 384 U.S. at 476). "*Miranda* warnings are required only if an individual is both 'in custody' and 'subjected to interrogation.'" *United States v. Arellano-Banuelos*, 912 F.3d 862, 865 (5th Cir. 2019) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)).

As for when a person is in "custody," *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). "Rather, a suspect is 'in custody' for purposes of *Miranda* 'when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of degree which the law associates with formal arrest." *United States v. Berngivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc) (quoting *Miranda*, 384 U.S. at 479).

As for interrogation, "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301. Statements given freely and voluntarily and without "compelling influence" fall outside *Miranda's* ambit and are admissible. *Miranda,* 384 U.S. at 478.

Here, Sergeant Jay Kniffen asked Traylor to speak with him after A.G. was taken to the hospital. ECF No. 25-8 at 108. Sergeant Kniffen understood that A.G. had been choking on the scene and was unaware of blunt force trauma or brain injury. *Id.* at 109. Traylor voluntarily followed Sergeant Kniffen to the Sheriff's office in someone else's vehicle. *Id.* at 108. At this point, Traylor was not in custody, handcuffed, or under arrest. *Id.*

The interview began, at which point Traylor was still free to leave. *Id.* at 116. Sergeant Kniffen tried to get details about what happened to A.G. and to establish a timeline. *See* ECF No. 25-12 (Part 1 of State's Exhibit 23 at trial) at 2:00-26:00. Traylor explained his version of events and offered varying explanations for A.G.s injury, including her clumsiness, choking, and accidentally "clipping" her head with a car door. *See id.* About twenty-six minutes into the interview, Sergeant Kniffen informed Traylor that he received information that A.G. had suffered severe blunt force trauma to the head and a brain injury. *Id.* at 26:00. Sergeant Kniffen testified that he started looking into Traylor as more of a suspect when he

obtained that information. ECF No. 25-8 at 120. Thirty-three minutes into the interview, Sergeant Kniffen told Traylor that he was being detained until he "figured everything out." ECF No. 25-12 at 33:00. He ceased asking Traylor questions, but Traylor continued to ask questions and express frustration and disbelief at the situation. *Id*. at 33:00-37:52.

Traylor then started asking questions to another officer standing guard in the interview room. At first, the officer refused to answer questions. *Id*. at 37:52. But eventually the guard asked Traylor some questions. The questions mostly had nothing to do with the offense. *Id*. at 37:52-46:00. At one point, the guard did ask, "well, what happened?. . . did [A.G.] fall down?" *Id*. at 46:21. Traylor denied this, repeating that A.G. had choked. *Id*. at 46:30. Traylor continued to make unsolicited comments, emphasizing the victim's clumsiness and that he did not know what happened. *Id*. at 47:15-51:30.

Later, Sergeant Kniffen returned to the interview room and told Traylor that he did not know what was going on when they started talking, but he had since learned that there was definitely blunt force trauma, and that Traylor was the sole caregiver at the time. *Id*. at 51:40-54:58. Sergeant Kniffen immediately attempted to give Traylor a copy of his rights and read through them, but Traylor refused to review his rights and continued to make unsolicited comments. *Id*. at 52:11-53:52. Eventually, Sergeant Kniffen managed to read Traylor his rights. *Id*. at 53:55-

54:28. A few minutes later, Traylor confirmed that he wanted to talk to his attorney. *Id*. at 54:28-56:05.[4]

The CCA could have reasonably determined that there was no *Miranda* violation under clearly established Supreme Court precedent. Traylor came to the interview voluntarily and was not detained until Sergeant Kniffen informed him that he was being detained. After Traylor became detained, Sergeant Kniffen left the room and did not interrogate him.

The guarding officer did ask Traylor some questions after Traylor complained that he "needed someone to talk to," but his questioning was mostly innocuous. ECF No. 25-12 at 37:52-46:00. The only questions from the guarding officer that arguably bore on the offense were, "well, what happened . . . did [A.G.] fall down?" *Id*. at 46:21. The questions stemmed from Traylor's continued insistence that A.G. was clumsy. The guarding officer could not have reasonably foreseen that Traylor would have backtracked from that insistence and incriminated himself in response to those questions, and indeed Traylor did not do so. *See*, *e.g.*, *United States v. Johnson*, 734 F.3d 270, 277 (4th Cir. 2013) (citing *Innis*, 446 U.S. at 301-02) (when determining whether an officer's question is an interrogation under *Miranda*, the court asks whether the officer should have known that that question was "reasonably likely to illicit an incriminating

---

[4] The State only offered the first 56:06 of the video recording into evidence. *See* ECF No. 25-8 at 118. Therefore, the Court focuses its analysis on that part of the video, which is contained on ECF No. 25-12 (State's Exhibit 23 at trial, volume 1).

response, or in other words, whether he should reasonably have foreseen that result").

Even if the guarding officer did interrogate Traylor in violation of *Miranda*, Traylor did not confess or say anything different than what he told Sergeant Kniffen earlier. Indeed, at no point after Traylor was informed that he was being detained did he confess or say anything inconsistent with what he had told Sergeant Kniffen initially. Traylor therefore cannot establish a reasonable likelihood of a different outcome even if his counsel successfully excluded the video from the point that Sergeant Kniffen informs Traylor that he is being detained. *See Richter*, 562 U.S. at 111.

Finally, when Sergeant Kniffen came back, he read Traylor his *Miranda* rights, and he did not interrogate Traylor before doing so. Any statements that Traylor voluntary gave to Sergeant Kniffen after Sergeant Kniffen returned to the room but before he read Traylor his *Miranda* rights were not in response to interrogation and were not violative of *Miranda*. *See*, *e.g.*, *United States v. Sultanov*, ---F. Supp. 3d---, 2024 WL 3520443, at *29 (E.D.N.Y. July 24, 2024) ("Volunteered statements, on the other hand, that are made by a suspect not in response to questions or actions by law enforcement are not the result of interrogation and do not require *Miranda* warnings.") (citing *United States v. Familetti*, 878 F.3d 53, 57-58 (2d Cir. 2017)).

The CCA reasonably applied *Strickland* and clearly established Supreme Court *Miranda* precedent in rejecting Traylor's claim that his counsel was

ineffective for not filing a written motion to suppress video of the police interview, and Traylor is not entitled to habeas relief on this claim.

### 2.   The CCA reasonably rejected Traylor's due process claim based on the prosecution's closing argument.

Traylor claims that his due process rights were violated because the prosecutor "described him, an African American man, as a 300lb gorilla" during closing arguments. ECF No. 9 at 8. The record belies this claim.

To succeed on a prosecutorial misconduct claim based on improper argument, the petitioner must show that the prosecutors' improper argument "so infected the penalty phase of the trial with unfairness as to make the resulting sentence a denial of due process." *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quotation marks and brackets omitted); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). It is "not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. "When a claim regarding the impropriety of the prosecution's argument is framed as a violation of due process, the appropriate inquiry is . . . whether the prosecution's comments so infected the trial with unfairness that there is a reasonable probability that the result would have been different if the proceeding had been conducted properly." *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) (citing *Foy v. Donnelly*, 959 F.2d 1307 (5th Cir. 1992)) (citation omitted).

In Texas, "there are four general categories of permissible jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3)

answer to argument of opposing counsel; or (4) plea for law enforcement." *Bell v. State*, 724 S.W.2d 780, 802-03 (Tex. Crim. App. 1986).

Here, the prosecutor's closing argument focused in part on the inconsistencies in Traylor's version of events and the varied explanations—eight in total—that he gave for the victim's injuries. ECF No. 25-10 at 21-25. The prosecutor summarized this portion of the argument by stating:

> Those are eight red flags for you. If he had been consistent and he had said, "I walk—" even something completely probable, "I walked out from the shower and there was a 300-pound gorilla in the room and he's standing over [A.G.'s] lifeless body," and no one believes him, and he sticks to his story over and over again, guess what, at least in that scenario all the medical evidence backs that up. But the problem is that there's not a 300-pound gorilla in that room. There's just a man, and there's a man who is lying to everyone trying to cover his butt.

ECF No. 25-10 at 25.

The prosecutor was not characterizing Traylor as a gorilla. Rather, the prosecutor was emphasizing how unbelievable Traylor's version of events was and arguing that it would have been more credible if he had started with an outlandish story and stuck with it. This argument was a reasonable deduction from the evidence and proper jury argument under Texas law. Therefore, the CCA reasonably rejected this claim, and Traylor is not entitled to habeas relief on it.

## Recommendation

The Court should deny Petitioner Eric Benjamin Traylor's federal habeas application.

SO RECOMMENDED.

November 5, 2024.

_____
REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

INSTRUCTIONS FOR SERVICE AND
<u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

29